**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ALLISON MOUZER, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. |
| v. | **CLASS ACTION** |
| UNITED PARKS & RESORTS, INC., D/B/A SEAWORLD PARKS & ENTERTAINMENT, INC., | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

Plaintiff Allison Mouzer, individually and on behalf of all others similarly situated, alleges as follows, based on personal knowledge and the investigation of counsel, and on information and belief as to all other matters.

**NATURE OF THE ACTION**

1. Plaintiff brings this Class Action Complaint ("Complaint") against United Parks & Resorts, Inc., D/B/A SeaWorld Parks & Entertainment, Inc. (hereinafter "United Parks" or "Defendant") for its use of bait-and-switch tactics that mislead consumers about the true price of tickets. Defendant uses these tactics to lure consumers into paying higher prices for tickets than they otherwise would.

2. United Parks is "a global theme park and entertainment company that owns or licenses a diverse portfolio of award-winning park brands and experiences, including SeaWorld, Busch Gardens, Discovery Cove, Sesame Place, Water Country USA, Adventure Island, and Aquatica."[1] Defendant wholly owns, and does business as, SeaWorld Parks & Entertainment, Inc.

3. SeaWorld Parks & Entertainment, Inc. operates the websites through which tickets are sold to Defendant's parks, including (as relevant here) SeaWorld, Aquatica, and Discovery

[1] https://unitedparks.com/about-us/ (last visited Nov. 10, 2025).

Cove in Orlando, Florida; Busch Gardens in Tampa, Florida; and Adventure Island in Tampa, Florida.

4. Through these online marketplaces[2], Defendant sells tickets to millions of consumers residing in Florida, neighboring states, and beyond. When a consumer purchases a ticket on Defendant's website, Defendant advertises an artificially low price for that ticket. However, the advertised price for each ticket is accompanied by an undisclosed and unavoidable "Service Fee," which is revealed only at the final checkout screen. Consumers cannot complete a ticket purchase without paying this mandatory fee.

5. Defendant unlawfully advertises and displays ticket prices on its websites without including all mandatory fees or charges that customers must ultimately pay. Defendant uses a deceptively low initial price to lure consumers into the purchase process—the "bait." Then, after the consumer has relied on that artificially-low advertised price, engaged in a multistep check-out process, and decided to buy, Defendant surreptitiously adds a mandatory "Service Fee"—the "switch."

6. In other words, Defendant conceals its mandatory fees until after consumers have invested substantial time selecting tickets and have committed to purchasing based on the incomplete, deceptively low advertised price. Each stage of Defendant's multi-step checkout process is designed to increase consumer commitment so that, by the time the hidden fees are finally revealed, consumers—having already expended time and effort—are more likely to complete the transaction.

7. Accordingly, Plaintiff brings this action individually and on behalf of all similarly situated consumers who purchased theme park tickets from Defendant's website during the relevant statutory periods.

**JURISDICTION AND VENUE**

[2] Defendant sells tickets to its theme parks through separate by functionally identical ticketing websites.

8. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23.

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). The putative class exceeds 100 members, the amount in controversy exceeds $5,000,000,[3] and at least one class member is a citizen of a state different from Defendant.

10. The Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Orlando, Florida. Defendant also conducts substantial business in Florida, including by operating multiple theme parks in this State and directing its marketing activities toward consumers throughout Florida. Through these activities, Defendant has purposefully availed itself of the privilege of conducting business in Florida.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the occurrences and wrongdoing complained of herein occurred in this District. Defendant also transacts business in this District, markets and sells tickets to consumers located here, and derived substantial revenue from those transactions.

## PARTIES

12. Plaintiff Allison Mouzer is a natural person residing in West Palm Beach, Florida.

13. Defendant is a corporation organized under the laws of Delaware with its principal place of business in Orlando, Florida. Defendant wholly owns, and conducts business as, SeaWorld Parks & Entertainment, Inc., a corporation organized under the laws of Delaware with its principal place of business in Orlando, Florida.

## PLAINTIFF'S EXPERIENCES

14. On February 19, 2025, Plaintiff Mouzer used one of Defendant's online ticketing websites to purchase four tickets for admission to Defendant's Discovery Cove theme park in Florida.[4]

---

[3] On information and belief, Defendant has sold at least hundreds of thousands of tickets during the statutory period.

[4] Plaintiff Mouzer also ordered two tickets for admission to Discovery Cove for guests under three years of age. She was not charged for these two tickets.

15. Defendant's website prominently advertises artificially low ticket prices—excluding mandatory fees—to lure consumers. The advertised prices never stated "plus applicable fees" otherwise indicated that additional mandatory charges would apply. When purchasing tickets, Plaintiff was presented with a drop-down menu allowing them to select the desired number of tickets. After selecting the desired quantity, Plaintiff was prompted to select a date. For each available date, a corresponding ticket price was displayed.

16. Having selected specific dates and ticket quantities at stated prices, Plaintiff finalized her selections by pressing a brightly colored "Add to Cart" button.

17. On the next screen, Plaintiff was offered additional optional add-on experiences.

18. On the following screen, Plaintiff was presented with an itemized breakdown that included the ticket price as well as a line labeled "Taxes & Fees."

19. Before proceeding to checkout, Plaintiff was prompted to input her email address. Then, on the final checkout screen, Plaintiff entered her billing information, including her full name, address, and phone number, followed by their credit card information.

20. After entering payment information, Plaintiff was presented with a display inviting donations to conservation programs as they scrolled down the final checkout screen. Only after scrolling past that section did Plaintiff, for the first time, encounter Defendant's hidden "Service Fee."

21. While the prior screen had referenced "Taxes & Fees," no portion of the hidden Service Fee consisted of lawful taxes or government-imposed charges. At the very bottom of the final checkout screen, Plaintiff was shown an itemized transaction summary showing a line item for "Taxes," as well as Defendant's "Service Fee."

22. Plaintiff Mouzer's February 19, 2025 transaction included a Service Fee of $64.99.

23. In charging the Service Fee, Defendant charged Plaintiff a significant, mandatory transaction fee that was not included in the listed price for tickets to Defendant's theme parks.

24. Plaintiff was unaware that the tickets she selected included additional mandatory fees at the time she made her selections.

25. The deceptively low, initially advertised price was a substantial factor in Plaintiff's decisions to purchase the tickets. Defendant lured Plaintiff in with deceptively low initial prices, cultivating purchasing commitment based on that initial price.

26. Defendant intentionally excluded its mandatory Service Fee from the displayed and advertised ticket prices and disclosed them only after Plaintiff—and all other consumers purchasing tickets through Defendant's websites—had invested significant time and effort selecting tickets.

**DRIP PRICING AND LATE-DISCLOSED HIDDEN FEES ARE DECEPTIVE, UNFAIR, ANTI-CONSUMER, AND ANTI-COMPETITIVE**

27. Drip pricing is a bait-and-switch pricing technique "in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying process."[5] In a drip pricing scheme, mandatory fees—like those charged by Defendant—are foisted upon consumers after they have been lured in by a misleadingly low advertised price. These surprise fees have been dubbed "junk fees" by the Federal Trade Commission ("FTC").[6] Bait-and-switch junk-fee markups are particularly widespread among online ticket platforms. Research shows that consumers ambushed by hidden fees at checkout pay upward of twenty percent more than when the actual price is disclosed upfront.[7]

---

[5] Trade Regulation Rule on Unfair or Deceptive Fees, Fed. Trade Comm'n (Jan. 2025), available at https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees.

[6] The FTC classifies "junk fees" as "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer, including goods or services that consumers would reasonably assume to be included within the overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (codified at 16 C.F.R. pt. 464).

[7] Morgan Foy, University of California-Berkley, Haas School of Business, *Buyer Beware: Massive Experiment Shows Why Ticket Sellers Hit You with Last Second Fees*, Feb. 9, 2021, available at https://newsroom.haas.berkeley.edu/research/buyer-beware-massive-experiment-shows-why-ticket-sellers-hit-you-with-hidden-fees-drip-pricing (concluding that consumer expenditure on tickets increased 21% when true price was not disclosed initially).

28. It is estimated that junk fees cost Americans over $90 billion each year.[8] Research has shown that consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the junk fee is revealed because they have already factored the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction.

29. Research also shows that consumers place stock in initial prices and tend to proceed with transactions even after exorbitant and unpredictable fees have been added—despite the fact that continuing to search for cheaper prices would be more optimal—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[9] Once consumers decide what to buy, they are unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming their search.[10]

30. Indeed, as companies that engage in junk-fee practices are aware, consumers choose products or services based on the advertised "base price," and not based on the price inclusive of fees, which is obscured by partitions in the purchase flow.[11] In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has

[8] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, Mar. 5, 2024, available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

[9] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017) at 17, available at https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[10] *Id.*

[11] Alexander Rasch et al., *Drip Pricing & Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior Org. 353 (2020), available at https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189?via%3Dihub (in controlled experiment, buyers "based their purchase decision exclusively on the base price."); *see also id.* (noting that "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer").

a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[12]

31. The FTC's Bureau of Economics has found that consumers are harmed by drip pricing because they are forced "either to incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [transaction], or both."[13]

32. The FTC has characterized junk fees as especially harmful when they are hidden (i.e., disclosed only at a later stage in the purchasing process), because openly disclosed junk fees enable consumers to immediately determine that the cost of an item is not favorable relative to the cost charged by competitors and choose to do business elsewhere.[14] As a result, the product or service listed by bad actors like Defendant appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of junk fees, is equally, if not more, expensive than those other companies' products or services.

33. Adding hidden junk fees after securing purchase commitment also generates significant burden for individual consumers, who, when confronted with drip pricing, "pay upward of twenty percent more than when the actual price was disclosed upfront."[15] By concealing the actual price of tickets, sellers like Defendant force consumers to spend additional time comparison-shopping for tickets than they otherwise would, which represents a cognizable injury.[16]

---

[12] Shelle Santana et al., (2020) *Consumer Reactions to Drip Pricing.* Marketing Science 39(1):188-210, available at https://doi.org/10.1287/mksc.2019.1207.

[13] Sullivan, *supra* note 8, at 16-17.

[14] Trade Regulation Rule on Unfair or Deceptive Fees, 88 Fed. Reg. 77420 (proposed Nov. 9, 2023) (codified at 16 C.F.R. pt. 464).

[15] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, *supra* note 5 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers").

[16] *See, e.g.*, *Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th Cir. 2024) ("Bait-and-switch pricing schemes like the one alleged here lead to injuries that consumers cannot reasonably avoid, which come in the form of higher prices and search costs.") (internal quotations omitted); Tom Blake et al., *Price Salience and Product Choice*, Marketing Science (2021) 40(4):619-636. https://doi.org/10.1287/mksc.2020.1261 (peer reviewed industry study finding that drip pricing "makes price comparisons difficult and results in consumers spending more than they would otherwise" and that "users who weren't shown the ticket fees upfront ended up spending about 20% more money and were 14% more likely to complete [the transaction]").

34. In sum, using bait-and-switch hidden-fee tactics is bad for markets and bad for consumers.

**HOW DEFENDANT'S HIDDEN "SERVICE FEES" ARE COLLECTED**

35. Defendant's hidden-fee tactics operate uniformly across all ticket offerings for Defendant's theme parks. When users select the "Buy Tickets" button on Defendant's websites, they are presented with a list of ticket types and corresponding prices—ranging from general admission daily tickets to anytime-entry, multi-day, multi-park, and season tickets. On that same screen, users are prompted to select the desired ticket quantity and desired date. After doing so, users click the "Add to Cart" button and are taken to a new screen that offers optional paid add-on experiences.

36. Only after consumers navigate through multiple screens to (1) select a specific number of tickets, (2) at a specific price, (3) for a specific date, (4) add those tickets to their cart, (5) accept or decline additional experiences, and (6) enter their payment information, are they finally confronted with Defendant's hidden "Service Fee," displayed immediately above the final "Pay" button.

37. This fee is initially presented under the false label of "Taxes & Fees," but not until the final point-of-purchase screen are Defendant's customers able to learn the real cost of their transaction.

38. Defendant's online purchase flow (i.e., the experience customers encounter when they purchase tickets to Defendant's parks) is intentionally designed with dark patterns—defined as online design tactics that trick or manipulate users into making choices they might not otherwise make—to heighten purchasing commitment and pressure consumers to complete transactions despite the sudden addition of significant, undisclosed fees relative to the total ticket price.

39. No portion of Defendant's hidden Service Fee constitutes any legitimate, government-imposed tax or fee.

40. Defendant's hidden Service Fee varies by theme park. The fee starts at $11.99 and increases on a per-ticket basis.

41. As depicted below, when users press the "Buy Tickets" button, they are presented with a list of ticket types and the prices for those tickets. Users are then prompted to select a quantity of tickets and a date of attendance.[17]




42. After clicking "Select Date," customers encounter a popup screen where they are prompted to choose the date and are quoted a ticket price for that date:

[17] The exemplar purchase screens displayed herein are encountered when users purchase tickets for Defendant's Aquatica theme park. Customers encounter an identical or substantially similar purchase flow screen (and the same "Service Fee") when they purchase tickets for Defendant's other parks.




43. Customers are then prompted to add the selected tickets to their cart:




44. Next, customers are directed to checkout, being quoted a Subtotal in large, bold letters with "Plus taxes & fees" in small, faint print, without the amount or type of "taxes & fees" being disclosed:




45. From there, customers encounter a screen offering certain additional paid experiences:




46. Then, only after selecting a quantity of tickets, a date, being quoted a ticket price, choosing to buy based on that price, and picking any additional experiences, are users confronted with the first indication of Defendant's hidden "fees":




47. As shown above, at the same time users are first shown the hidden fee, they are put on a countdown clock. Countdown clocks assist rulebreakers like Defendant to pressure consumers into completing their purchases at the end of their transaction despite the increased price by creating a false sense of urgency. The FTC has called out these countdown tactics as an anti-consumer dark pattern.

48. Moreover, by including a total for both "Taxes & Fees" Defendant further obscures the actual price for the Service Fee and misleads consumers into believing it is a government imposed charge.

49. When users proceed to the final point of purchase screen, they are first directed to input all of their personal, billing, and payment information:




50. After inputting their information, users then must scroll past a donation option before finally being presented with an "Order Summary." This Order Summary, which is right above the final "Pay" button, finally reveals to customers the "Service Fee" they are required to pay:




51. By hiding this mandatory fee until the very last step of the sale, Defendant charges illegal hidden fees in violation of the FDUTPA. Defendant, a multi-billion-dollar enterprise with significant legal resources, is undoubtedly aware of Florida law.

52. Complying with the FDUTPA and other consumer protection statutes is straightforward: a company like Defendant must display and advertise prices of its goods or services that include all mandatory fees. Defendant could have easily configured its website to list ticket prices inclusive of all mandatory fees. However, Defendant chose not to, precisely to take advantage of the fact that hiding the mandatory fees at the initial stages increases conversions from click-through browsing to ticket sales, even as it harms consumers, disadvantages compliant competitors, and is illegal.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action individually and on behalf of all persons similarly situated.

54. Plaintiff seeks to represent a class defined as:

> All persons who, within the applicable statutory period, up to and including the date of final judgment in this action, purchased a ticket from a ticketing website operated by Defendant where all mandatory fees were not included in the initially displayed or advertised price of the ticket.

55. Excluded from the class is Defendant, its corporate parents, subsidiaries, franchisees and affiliates, officers and directors, any entity in which Defendant has a controlling interest, and the legal representatives, successors, or assigns of any such excluded person or entities, and the Court to which this action is assigned. Also excluded is the Judge or Magistrate Judge presiding over this action, their staffs, and their families.

56. Plaintiff reserves the right to amend or modify the class description with greater specificity or further division into subclasses or limitation to particular issues based upon discovery or further investigation.

57. ***Numerosity***. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is currently unknown to Plaintiff, on information and belief, the Class is comprised of hundreds of thousands of consumers. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by postal or electronic mail and/or publication through the Defendant's sales records.

58. ***Commonality***. Common questions of law and fact exist for all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

a. Whether Class members were uniformly subjected to a hidden fee;

b. Whether Defendant's conduct violated the FDUTPA;

c. Whether Plaintiff and the Class are entitled to damages, restitution, and/or other remedies available under the FDUTPA; and

d. Whether Plaintiff and the Class are entitled to attorneys' fees and costs.

59. ***Typicality***. Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all proposed Class members, was exposed to Defendant's misrepresentations, purchased tickets on Defendant's websites, and sustained damages from Defendant's uniform wrongful conduct, based upon Defendant's wrongful acts alleged herein.

60. ***Adequacy***. Plaintiff will fairly and adequately protect the Class members' interests. Plaintiff has no interest antagonistic to the Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class actions and consumer protection cases.

61. ***Superiority***. The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

62. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

63. Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## CLAIMS FOR RELIEF

### Count I
### Violation of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §§ 501.201, *et seq.*
### (On Behalf of Plaintiff and the Class)

64. Plaintiff incorporates the preceding paragraphs of the Complaint as though fully set forth herein.

65. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances, and unfair if it offends established public policy or is immoral, unethical, oppressive, or substantially injurious to consumers.

66. In construing the FDUTPA, consideration shall be given to the interpretations of the Federal Trade Commission. Fla. Stat. § 501.203(3)(b).

67. The stated purpose of the FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). In determining whether conduct violates the FDUTPA, a court should consider whether the FTC and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under federal law. *Mack v. Bristol-Myers Squibb Co.,* 673 So. 2d 100, (Dist. Ct. App. 1996)

68. At all times material, Defendant was a "person" within the meaning of Fla. Stat. § 501.203(6) and was engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8) by marketing and selling theme park tickets available to consumers in Florida and throughout the United States.

69. Defendant maintains its principal place of business and executive operations in the State of Florida, from which it manages, directs, and controls all aspects of its theme parks, including marketing, online websites, ticket pricing, and customer-service operations.

70. The deceptive and unfair conduct challenged herein originated, emanated, and was orchestrated from Defendant's headquarters in Florida. Defendant's pricing policies, marketing, and on-screen disclosures were developed, approved, and disseminated from Florida, and all online transactions nationwide—including those affecting out-of-state consumers—were processed through systems and personnel located in Florida.

71. Plaintiff and Class members, as consumers under the FDUTPA, have been harmed by Defendant's unconscionable, deceptive, and unfair acts as described in the Complaint. These acts include advertising ticket prices for Defendant's theme parks that did not include all mandatory fees or surcharges and displaying deceptively low prices throughout the purchase process while concealing a mandatory "Service Fee" that was only revealed on the final checkout screen, after consumers had committed substantial time and effort to the transaction.

72. Defendant's omission of the mandatory fee was material, as the total price of admission tickets was a primary factor in consumers' purchasing decisions.

73. The concealment and omission of material facts and misrepresentations and deceptions alleged in the preceding paragraphs occurred in connection with Defendant's trade and commerce in Florida.

74. Defendant intentionally designed its sales process to mislead consumers by: presenting lower initial prices; hiding the true, higher cost of tickets until the end of the checkout process; and using "dark patterns" (as described by the FTC), including countdown timers, to heighten purchasing pressure and reduce the likelihood that consumers would abandon the transaction after learning of the hidden fee.

75. Defendant's deceptive conduct had the tendency, capacity, and effect of misleading reasonable consumers and did in fact mislead Plaintiff and members of the Class.

76. Plaintiff and the Class reasonably relied on Defendant's representations that the listed price was the full ticket price and were induced to purchase tickets and pay the hidden service fee as a result.

77. Plaintiff and the Class suffered ascertainable losses as a direct and proximate result of Defendant's unlawful conduct, including, but not limited to, the amount of the undisclosed and unlawful fees paid, the loss of the opportunity to make informed purchasing decisions, and the expenditure of additional time and cognitive effort caused by Defendant's deception.

78. Defendant's violations of the FDUTPA were willful, knowing, and intentional, as Defendant knew or should have known of its obligation to truthfully and accurately present the price of admissions tickets and nonetheless continued to advertise and sell tickets using hidden-fee, drip-pricing tactics.

79. Plaintiff and Class members demand an award against Defendant for violation of Section 501.201, *et seq*., and demand as damages the repayment of all money wrongfully retained by Defendant in violation of the FDUTPA, plus interest, and the attorneys' fees and costs incurred in bringing this action. Plaintiff further demand all other remedies and damages available under FDUTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, pray for relief and judgment as follows:

a. For an order certifying this case as a class action and appointing Plaintiff's counsel as Class Counsel;

b. For an order finding in favor of Plaintiff and the Class on all claims alleged herein;

c. For actual or statutory damages in amounts allowed by law and/or to be determined by the Court and/or a jury;

d. For prejudgment interest on all amounts awarded;

e. For an order of restitution and all other forms of equitable monetary relief appropriate by statute;

f. For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit, as appropriate by statute; and

g. Awarding such other equitable or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

Dated: November 13, 2025

Respectfully submitted,

By: */s/ Andrew J. Shamis*
Andrew J. Shamis
(FL Bar No. 101754)
Edwin E. Elliott
(FL Bar No. 1024900)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
(305) 479-2299
ashamis@shamisgentile.com
edwine@shamisgentile.com

Scott Edelsberg
(FL Bar No. 100537)
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Phone: (786) 289-9471
Fax: (786) 623-0915
Email: scott@edelsberglaw.com

Jeffrey D. Kaliel (*pro hac vice* forthcoming)
Sophia G. Gold (*pro hac vice* forthcoming)
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
(202) 350-4783
jkaliel@kalielgold.com
sgold@kalielgold.com

*Counsel for Plaintiff and the Proposed Class*